## CIRCUIT COURT OF FAIRFAX COUNTY

Carolyn Chappell,
Duston Grefe,
and Lauren Jennings

v.

Zoning Appeals Board
of the City of Fairfax

June 17, 2004

Case No. (Law) 212517

BY JUDGE JANE MARUM ROUSH

This matter came on for a hearing on March 23, 2004, on the petitioners' appeal of the decision of the City of Fairfax Board of Zoning Appeals (the "BZA"). At that time, the court took the matter under advisement. I have now had the opportunity fully to consider the pleadings, exhibits, and testimony of the witnesses. For the reasons stated below, pursuant to Va. Code § 15.2-2314, the BZA's decision will be reversed.

### Facts

This case involves the interpretation of Virginia's Chesapeake Bay Preservation Act, Va. Code Ann. §§ 10.1-2100, et seq., and the provisions of the Code of the City of Fairfax enacted pursuant to that act, City of Fairfax Code §§ 110-77, et seq.[1] The petitioners are Carolyn Chappell, Duston Grefe, and Lauren Jennings, siblings who own a parcel of land in the City of Fairfax. The Petitioners challenge the BZA's decision affirming the zoning administrator's determination that the Petitioners' property includes a

---

[1] The City's Chesapeake Bay Preservation Ordinance has been amended significantly since the time of the BZA's decision in this case. The Court will be applying that version of City ordinance as was in effect at the time of the BZA's decision on March 4, 2003.

"Resource Protection Area" (" RPA" ) under Virginia's Chesapeake Bay Preservation Act and the City's Chesapeake Bay Preservation ordinance. The issue is important to the parties because the existence of RPA on the property negatively affects the Petitioners' ability to develop the property and reduces the property's fair market value. Because the City has indicated its intention to condemn the property to prevent its development, the value of the property is of interest to both the Petitioners and the City.

The area now designated as RPA on the Petitioners' property consists of a "735 linear feet stream bed identified on [Unites States Geological Survey] maps as a portion of an unnamed intermittent tributary to Rabbit Run, coursing generally southward across the Property emanating from a culvert on the northern end of the land and that varies from some six feet wide, down to three to four feet." See Petition, & 5. It is undisputed that this is an intermittent, and not perennial, stream. Petition, & 5; Response to Petition, & 5. There is also a small area of 4,286 square feet (slightly less than 0.10 acre) of what are referred to as nontidal wetlands, subject to federal jurisdiction under the Clean Water Act. Petition, & 5.

In 1999, when the City originally mapped its RPA under its Chesapeake Bay Preservation Act, no area of the Petitioners' property was shown as containing RPA. Later, the City remapped its RPA and determined that there was RPA on the property. After the Petitioners questioned the inclusion of RPA on their property, representatives of the City told the Petitioners that the RPA had been mapped on the property in error. The tax assessment on the property was increased to reflect the absence of RPA on the property and, consequently, its higher fair market value.

Assured that there was no RPA on the property, the Petitioners began in earnest the preliminary studies needed to subdivide the property for single family residences. At the suggestion of the City, the Petitioners wrote the zoning administrator asking for a formal ruling that there was no RPA on the property. The zoning administrator took the request under advisement.

The Petitioners submitted a subdivision plan to the City. Included in that submission was a study prepared by Wetlands Studies and Solutions, Inc., that concluded that there is no RPA on the property. Also submitted in connection with the subdivision plan were two permits: one from the Army Corps of Engineers and one from the Virginia Department of Environmental Quality. The import of those two permits was that, although there is a small area of nontidal wetlands on the property, it is so small that it may be disturbed pursuant to a "nationwide" permit, no "individual permit" is required, nor is any "compensatory mitigation" required if the area is disturbed. Petition, & 17; Opposition to Petition, & 17.

144

The Petitioners' proposed subdivision of the property was met with opposition from neighbors who preferred that the property be kept as open space. For example, one neighbor wrote to the City opposing the development of the property because "our neighborhood has always used that as a park and enjoyed it as a nature preserve. It is an area where children play and people walk their dogs." Record, p. 15. On November 12, 2002, the City Council voted to condemn the property, because, to quote the Mayor, "if we didn't go the condemnation route, [the property] would have been redeveloped by right." [2]

On November 22, 2002, the zoning administrator issued her determination that there is RPA on the property. In December 2002, the City's planning commission disapproved the Petitioners' subdivision, citing the presence of RPA on the property. Finally, in March 2003, the BZA affirmed the zoning administrator's decision that the property contains RPA.

## Standard of Review

The standard of review for this appeal is as set forth in Va. Code § 15.2-2314: In the case of an appeal from the board of zoning appeals to the circuit court of an order, requirement, decision, or determination of a zoning administrator or other administrative officer in the administration or enforcement of any ordinance or provision of state law, the decision of the board of zoning appeals shall be presumed to be correct. The appealing party may rebut that presumption by proving by a preponderance of the evidence, including the record before the board of zoning appeals, that the board of zoning appeals erred in its decision. Any party may introduce evidence in the proceedings in the court. Virginia Code § 15.2-2314 (Repl. Vol. 2003).

The above-quoted paragraph of the statute was added to Va. Code § 15.2-2314 by the General Assembly in 2003. Before that amendment, the appellant in an appeal from any BZA action was required to show that the BZA applied erroneous principals of law or that its decision was plainly wrong and in violation of the purpose and intent of the zoning ordinance. *City of Suffolk v. Board of Zoning Appeals*, 266 Va. 137, 580 S.E.2d 796 (2003). That more stringent standard has been codified for appeals from "any decision of the board of zoning appeals that denie[s] or grant[s] an application for a variance or application for a special exception." In a case such as this case, however, involving "an appeal from the board of zoning appeals to the circuit court of an order, requirement, decision, or determination of a zoning administrator or other administrative officer in the administration or enforcement of any ordinance or provision of state law," the appellant may

---

[2] The City's condemnation proceeding is presently pending in this court. See *City Council of the City of Fairfax v. Carolyn Chappell et al.*, At Law No. 213442.

rebut the presumption of correctness by showing, by a preponderance of evidence, that the BZA "erred in its decision."

*Applicable Law*

Regulations promulgated by the Chesapeake Bay Local Assistance Board pursuant to Virginia's Chesapeake Bay Preservation Act define RPA as:

> That component of the Chesapeake Bay Preservation Area comprised of lands adjacent to water bodies with perennial flow that have an intrinsic water quality value due to ecological or biological processes they perform or are sensitive to impacts which may result in significant degradation to the quality of state waters.

9 VAC 10-20-40, Definitions. The City's Chesapeake Bay Preservation ordinance that was in effect at the time of the zoning administrator's and the BZA's decision identified RPA as:

> The component of the Chesapeake Bay Preservation Area comprising lands at or near the shoreline that have an intrinsic water quality value due to the ecological and biological processes they perform or are sensitive to impacts which may result in significant degradation to the quality of state waters. In their natural condition, these lands provide for the removal, reduction, or assimilation of sediments, nutrients, and potentially harmful or toxic substances in runoff entering the Bay and its tributaries, and minimize the adverse effects of human activities on state waters and aquatic resources. The resource protection area must include the following:
>
> (1) Non tidal wetlands connected by surface flow and contiguous to tributary streams.
> (2) Tributary streams.
> (3) Such other sensitive lands that, if developed, might cause significant degradation to the quality of state waters.
> (4) Buffer areas not less than 100 feet in width located adjacent to and landward of the components listed in subsections (1) through (3) of this definition and expanded to include the 100 year floodplain.

City Code, § 110-77 (repealed).[3]

---

[3] The City's ordinance has since been amended to include in its definition of RPA "intermittent streams that remain largely in a natural condition and that have not been significantly impacted

In determining the property contained RPA, the zoning administrator relied on § 110-77(3). In other words, she found that the property included "such other lands that, if developed, might cause significant degradation of state waters." Petition, & 30; Response to Petition, & 30. Specifically, the zoning administrator opined that the intermittent stream on the property "is also a nontidal wetland" and that, "given the development pattern in the City, and that there are few, if any undeveloped stream corridors left, the development of the area adjacent to this stream bed might significantly degrade water quality." Petition, & 31; Response to Petition, & 31. It is this determination that the Petitioners claim is error requiring reversal of the BZA's affirmance of the zoning administrator's determination.

## Discussion

Having considered carefully the pleadings, the exhibits, the record of the proceedings before the BZA, and the testimony adduced the trial on March 23, 2004, the Court concludes that the Petitioners have rebutted the presumption of correctness of the BZA's determination by showing, by a preponderance of the evidence, that the BZA erred in its decision.

The preponderance of the evidence supports the Petitioners' position that the property contains no "such other sensitive lands that, if developed, might cause significant degradation to the quality of state waters."

The Court found highly credible and persuasive the testimony of Michael S. Rolband, the president of Wetlands Studies and Solutions, Inc. ("WSSI"), who was stipulated to be an expert in wetlands studies. Mr. Rolband testified that, in his professional opinion, there is no RPA on the property. In his view, "the streams and wetlands found on the site do not reasonably satisfy any criterion established by state law or local ordinance for identification of such a natural feature as a RPA because the development of the property and the disturbance of the nontidal wetlands would not degrade the quality of State waters." See Rolband Affidavit, Record, pp. 225-29, at & 9. Mr. Rolband, who has consulted with the City in the past about the City's RPA designations, opined that the designation of this property as containing RPA is not consistent with the City's treatment of similar land in the City. Mr. Rolband testified that "of the many RPA delineations in which WSSI has been engaged, I can state without equivocation that virtually no study we have performed has presented so clear an example of a natural feature that does not satisfy any of the criteria necessary to qualify as RPA." *Id.* at & 11.

---

by adjacent development, as depicted on the City's Chesapeake Bay preservation area map." City Code § 110-79 (Ordinance No. 2003-22, 11-25-03).

Mr. Rolband pointed out that the zoning administrator and the Chesapeake Bay Local Assistance Department (" CBLAD" ) with whom she consulted made a fundamental mistake in evaluating this property. CBLAD advised the zoning administrator that the intermittent stream on the property is a "nontidal wetland." In Mr. Rolband's view, this was clearly wrong. To be a nontidal wetland, the stream area would have to have three characteristics: hydric soil, hydrophytic vegetation, and wetland hydrology. See Tr., pp. 77-78. This stream does not have those three characteristics.[4] The zoning administrator repeated this mistake in her determination that the property contained RPA. See Record, p. 60. At the March 23, 2004, hearing, the zoning administrator conceded that this was an error, but she testified that when she wrote that the intermittent stream on the property "is a nontidal wetland," she meant that "the intermittent stream carries some of the characteristics, and that is a more accurate statement, of a nontidal wetland rather than being specifically a nontidal wetland." Tr., p. 110-11.

Supporting Mr. Rolband's opinion is the fact that the Army Corps of Engineers, after an on-site inspection and evaluation of the property, issued a "404 certificate" for the property and Virginia's Department of Environmental Quality issued a "401 certificate" for the property. The import of those two certificates is that the Army Corps of Engineers and the Department of Environmental Quality determined that there will be no incremental or cumulative effect in any significant way to the state water quality or to the environment in general if this property is developed. Of course, any development will have to address storm water management as a "best management practice" required by the Chesapeake Bay Preservation Act and the regulations promulgated thereunder.

The Court found less persuasive the BZA's evidence that the zoning administrator properly found RPA on this property.

Ralph C. Jones, a professor of and the chair of environmental science and policy at George Mason University, testified as an expert on the issue of the effect of removal of vegetation and the effect of development on stream quality. Professor Jones opined that the removal of vegetation from the property will jeopardize the property's riparic area, which he described as the area bordering the intermittent stream that acts like a sponge, absorbing pollutants that would enter from the side. In Professor Jones's view, any disturbance of the vegetation along the intermittent stream will adversely affect "the intermittent stream's ability to absorb and process ... nutrients and other pollutants and to hold back runoff." He further opined that the

---

[4] It is not disputed that there is a very small area of nontidal wetlands on the property. That is not the same area presently under discussion. Mr. Rolband opined that it was a fundamental error to consider the intermittent stream to be a nontidal wetland.

disturbance of this vegetation for the purposes of building would jeopardize the water quality due to the pollutants that would by generated by the development and the water that would be generated by impervious surfaces. Tr. pp. 120-21, 128. He testified that the development of the property would have no detectable impact on the quality of the waters of the Chesapeake Bay.

While the Court found Professor Jones's testimony credible as far as it went, it was ultimately unpersuasive as his opinion failed adequately to consider that any development of the property would have to be accompanied by a BMP, or, in layman's terms, storm water management. Thus, his opinions appeared to the Court to be a generic description of what might result from any disturbance of any vegetation along any intermittent stream.

Similarly, the zoning administrator's determination relied on generalized statements of policy to the effect that it is important to consider the significant role that small streams play in the ecosystem. The zoning administrator then states, in conclusory fashion, that "Thus, it can be concluded that the subject site provides for the removal, reduction, or assimilation of sediments, nutrients, and potentially harmful or toxic substances in runoff entering the Bay and its tributaries, and further minimizes that adverse effects of human activities on state waters and aquatic resources."

It is important to note here that the Chesapeake Bay Preservation Act is not a "no growth" statute. The state's Chesapeake Bay Preservation Act begins with the observation that:

> Healthy state and local economies and a healthy Chesapeake Bay are integrally related; balanced economic development and water quality protection are not mutually exclusive.

Va. Code § 10.1-2100.

## Conclusion

In sum, the Petitioners have rebutted the presumption of correctness of the BZA's decision by demonstrating to the satisfaction of the Court and by a preponderance of the evidence that the development of the property with appropriate BMPs will not threaten significantly to degrade the quality of state waters. The Court found more credible and persuasive the Petitioner's evidence, specific and detailed to this property, that the property does not contain RPA. The Court shares the BZA's concern that the Chesapeake Bay be protected. Nonetheless, there is no persuasive evidence that the property contains "such other sensitive lands that, if developed, might cause significant degradation to the quality of state waters." Thus, I conclude that the BZA erred in affirming the zoning administrator's determination that there exists RPA on the Petitioner's property.